# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

       Plaintiff,

       v.

Robert David Boedigheimer,

       Defendant.

**MEMORANDUM OPINION
AND ORDER**
Criminal No. 13-296 ADM/FLN
Civil No. 17-4768 ADM

_____

Julie E. Allyn, Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

Robert David Boedigheimer, pro se.

_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Defendant Robert David Boedigheimer's ("Boedigheimer") Motion to Vacate under 28 U.S.C. § 2255 [Criminal Docket No. 130] (the "2255 Motion").[1]  Also before the Court is Boedigheimer's Motion to Amend the Motion to Vacate under 28 U.S.C. § 2255 [Docket No. 137].  For the reasons set forth below, Boedigheimer's motions are denied.

## II. BACKGROUND[2]

On June 17, 2014, following an 11 day trial, a jury returned a verdict finding Boedigheimer guilty on two counts of money laundering and one count of making a false statement to an IRS agent.  See Verdict [Docket No. 64].  On March 9, 2015, Boedigheimer was

---

[1] All docket citations are to the Criminal Docket.

[2] The background set forth herein is a summary of only the operative facts relevant to this Motion.

sentenced to a below guideline sentence of 60 months' imprisonment on the three counts.   See Sentencing J. [Docket No. 92].

Boedigheimer now brings this 2255 Motion and argues that he received constitutionally deficient representation by his trial and appellate attorneys.

## A.  Boedigheimer's Financial Troubles

Boedigheimer was a personal injury attorney who had owned his own law firm since 1995.  Trial Tr. [Docket Nos. 109–122] 1471:20–25.  In 2006, Boedigheimer's firm started experiencing financial difficulties.  Id. 1484:2–6.  The financial issues grew when Boedigheimer and his law partner, Sam McCloud ("McCloud"), ended their professional relationship, and Boedigheimer started a new firm.  Id. 1472:23–25.

While McCloud Boedigheimer were partners, McCloud brought between $60,000 to $70,000 a month to the firm.  Id. 1474:9–15.  This stream of income ended when McCloud departed.  Id. 1474:1–8.  The finances of Boedigheimer's practice also changed in 2006.  Insurance companies were only offering $4,000 to $7,000 to settle cases that Boedigheimer used to be able to settle for $15,000 to $18,000.  Id. 1490:20–24.  Consequently, Boedigheimer was required to litigate more cases, which translated into out-of-pocket expenses that would not be recovered for a year or more.  Id. 1491:6–17.

Boedigheimer started falling behind on his bills, and he had trouble making payroll obligations for the employees of his firm.  Id. 1485:14–19.  Boedigheimer's mother was the law firm's office manager, and even she would occasionally not collect a paycheck due to the firm's financial difficulties.  Id. 1648:4–5; 1649:4–19.  One attorney at the firm accepted a reduction in pay, while another attorney elected to leave the firm.  Id. 197:21–198:17; 259:22–260:15.

To alleviate his financial obligations, Boedigheimer started borrowing money from his family and friends, including his brother-in-law, Brandon Lusk ("Lusk"). Id. 289:19–24; 308:2–5; 323:5–8; 877:16–22; 1649:15.

### 1. Boedigheimer's Financial Transactions with Lusk

In May 2009, Boedigheimer asked Lusk for $10,000. Id. 877:16–20. Lusk agreed to loan Boedigheimer $10,000 at 10% interest, and the two executed a promissory note to memorialize the loan. Id. 877:21–22; 880:7–881:7.

On September 22, 2009, Boedigheimer and Lusk agreed to refinance the loan. Id. 888:17–24. Boedigheimer agreed to repay Lusk with a check for the $10,000 principal as well as $83.33 in interest. Id. 893:15–894:2. Lusk then gave Boedigheimer another $10,000 in cash, and the two executed another promissary note. Id. 891:24–892:19.

On January 29, 2010, Boedigheimer and Lusk again agreed to refinance. Id. 899:7–10. Boedigheimer provided Lusk a check for the $10,000 principal plus interest to satisfy the earlier loan, and Lusk gave Boedigheimer another $10,000 in cash. Id. 899:18–901:11. This loan also came with 10% interest and was again memorialized with a promissory note. Id. 899:3–6.

### 2. Boedigheimer employs Lusk

In late 2009, Boedigheimer agreed to employ Lusk as a consultant to his law firm. Id. 904:1–5. Lusk's responsibilities included soliciting potential clients. Id. 916:23–917:6. As part of this arrangement, Lusk would give Boedigheimer $5,000 a month in cash, and Boedigheimer's firm would issue Lusk a payroll check every month in return. Id. 904:3–13.

Lusk signed an employment agreement that stated, "Lusk has . . . experience in networking, marketing and sales. Boedigheimer Law Firm, P.A. desires to hire [Lusk] to utilize

his contacts and skills in marketing, networking and sales to locate, recruit, develop and maintain clients for the Boedigheimer Law Firm, P.A." Id. 925:18–24. The contract additionally stated that Lusk would receive training and skills as a result of his employment. Id. 927:1–4. Lusk had no education or experience working as a marketer, he spent almost no time at the law firm, and he did not receive any training and skills from Boedigheimer or his law firm. Id. 926:5–23; 927:9–11; 930:7–14; 932:17–19. Although Boedigheimer and Lusk did discuss the possibility of Lusk speaking with chiropractors to attract potential clients to Boedigheimer's law firm, Lusk never did such a thing. Id. 916:18–917:18. Behind only Boedigheimer himself, Lusk was the second highest paid member of the firm. Id. 928:19–23.

From March 26, 2010, to January 28, 2011, Lusk provided approximately $55,000 in cash to Boedigheimer as part of this employment arrangement. Trial Exh. 269.

**B. The Richard Kay Investigation**

In June 2010, Minnesota Bureau of Criminal Apprehension Special Agent Thomas Oliveto and Internal Revenue Service Special Agent Lucinda Schad ("Agent Schad") began investigating Richard Kay ("Kay") based upon information that he was trafficking large quantities of marijuana in southeastern Minnesota. Id. 344:12–22. Two of Kay's mid-level distributors were Lusk and Jason Meek ("Meek"). Id. 356:17–22. In 2011, Meek was on track to make $600,000 distributing marijuana for Kay, and Lusk was expecting to make slightly less. Id. 423:7–19.

In addition to partnering in distributing marijuana, Lusk and Meek were equal partners in Rochester's Reliable Rentals, a home rehabilitation business. Id. 480:5–9. Lusk and Meek used the business to launder cash obtained through their marijuana distributing. Id. 479:14–482:23.

4

Later in 2010, Kay discovered GPS tracking devices that law enforcement had placed on his vehicles. Id. 361:5–25. After Kay became aware that he was being monitored and their covert investigation was compromised, law enforcement approached individuals connected to Kay who were suspected of having knowledge of Kay's criminal activities. Id. 362:12–363:7. On March 29, 2011, officers contacted Meek, who afterward informed Lusk that he had been approached by law enforcement. Id. 365:15–23; 493:2–19. After speaking with Meek, Lusk contacted his attorney brother-in-law Boedigheimer. Id. 993:1–5.

**C. Lusk and Boedigheimer**

Boedigheimer referred Lusk to Mark Kelly ("Kelly"), an attorney who shared an office with Boedigheimer. Id. 993:15–20. Kelly in turn recommended an attorney with federal experience, Steve Grimshaw ("Grimshaw"). Id. 993:21–994:5. Boedigheimer, Lusk, Kelly, and Grimshaw met, and sometime thereafter Lusk signed a retainer agreement, which provided Boedigheimer a referral fee. Id. 1296:21–1297:22.

Grimshaw contacted the United States Attorney's Office, who extended Lusk a "no charge deal" requiring Lusk to cooperate with law enforcement by testifying truthfully. Id. 1289:1–10. Grimshaw arranged for Lusk to attend a proffer meeting with the United States Attorney's Office and advised him to be completely forthcoming about his criminal activities. Id. 1291:4–12; 1294:4–1295:16.

During the April 4, 2011 proffer meeting, which Boedigheimer requested he attend with Lusk, Lusk was asked about his employment and the disposition of his drug proceeds. Id. 376:2–4, 16–18; 1301:7–18; 1306:2–6. Lusk did not disclose his financial arrangement with Boedigheimer during the proffer meeting. Id. 376:7–15.

5

During its proffer session with Meek, the United States Attorney's Office learned that Lusk was laundering money through Boedigheimer. Id. 379:3–20; 381:2–13. Investigators obtained checks that were coming from the Boedigheimer law firm to Lusk. Id. 381:4–5. Lusk was then invited to attend a second proffer meeting, this time without Boedigheimer's presence. Id. 381:17–382:1. During his second proffer meeting, Lusk told law enforcement about his agreement with Boedigheiemer to exchange cash for payroll checks to make his income appear legitimate. Id. 382:22–4.

**D. Boedigheimer is Charged**

On June 29, 2011, law enforcement conducted a search warrant at Boedigheimer's law firm. Id. 712:6–10. Before the search began, Agent Schad questioned Boedigheimer about the payroll checks his firm issued to Lusk. Id. 530:8–14; Trial Exh. 105. Boedigheimer told Agent Schad that Lusk was legitimately employed by his firm to do marketing. Trial Exh. 105; Jury Instrs. [Docket No. 62] at 33.

After his law firm was searched, Boedigheimer retained counsel, who hired an investigator for assistance. Id. 437:10–22. Boedigheimer gave his cellular telephone to the investigator, who retrieved text messages between Boedigheimer and Lusk regarding their payroll arrangement. Id. These messages were turned over to law enforcement in January 2012 to support their defense theory. Id. 440:1–9.

Government investigators, however, were already in possession of Boedigheimer's text messages, having obtained them from his personal computer during the search of his law firm. Id. 1263:14–1265:4. Comparison of the two sets of messages shows that five incriminating text messages had been deleted from the phone Boedigheimer provided to the investigator.

6

1268:8–16.  The deleted text messages included a message from Boedigheimer asking Lusk for money, and Lusk agreeing to prepay $10,000 for the upcoming pay period.  Id. 2170:22–1271:6.

On December 10, 2013, Boedigheimer was charged with two counts of money laundering and one count of making a false statement to an IRS agent.  See Indictment [Docket No. 1].

**E.  The Trial**

At trial, Lusk was called as a prosecution witness.  Lusk testified that Boedigheimer knew about his marijuana dealing, and that Boedigheimer knew that the cash he provided either as a loan or as part of his "employment" arrangement were proceeds from his marijuana distributing.  Trial Tr. 876:11–13; 881:12–882:5; 893:12–14; 900:4–6; 914:12–22.  Lusk also testified that on the way to his first proffer meeting, Boedigheimer told Lusk not to say anything to law enforcement about their financial arrangement "because it could ruin me."  Id. 1000:11–16.

At the close of the Government's case, defense counsel objected to the admission of two summary exhibits, including Government Exhibit 269 that summarized payments Lusk made to Boedigheimer.  Id. 1333:1–16.  The objection was overruled.  Id. 1334:22–1335:16.  Defense counsel also moved for judgment of acquittal.  Id. 1336:19–1340:17.  That motion was denied as well.  1773:13–17.

Boedigheimer testified in his own defense.  During cross-examination, Boedigheimer was questioned about McCloud's conviction for tax evasion.  Id. 1706:20.  The question posed to Boedigheimer was, "Your former partner, Sam McCloud, had been prosecuted –."  Id. 1706:20.  Before Boedigheimer could answer, defense counsel objected, and the issue was discussed outside the presence of the jury.  Id. 1706:21–1707:7.  Defense counsel sought a mistrial,

arguing that the prosecution invited error by telling the jury that Boedigheimer's former mentor was prosecuted for tax evasion. <u>Id.</u> 1708:22–1709:15.

The Court denied the motion for mistrial. <u>Id.</u> 1716:13–1717:21. The jury was summoned back into the courtroom, and the Court gave a curative instruction:

> Members of the Jury, I'd like to specifically instruct you once again that what the attorneys say or questions asked are not evidence in this case and you are ordered to disregard the last question asked by Mr. Schleicher. At this point we will proceed.

<u>Id.</u> 1718:10–14. No further mention of McCloud's prosecution was made, and the Court reiterated to the jury during final instructions that questions from counsel are not evidence. Jury Instrs. at 6.

On June 17, 2014, the jury returned a guilty verdict on all counts.

## F. Post-Trial

### 1. Motion for Judgment of Acquittal or a New Trial

On June 23, 2014, Boedigheimer moved for Judgment of Acquittal, or in the alternative, for a New Trial. Mot. J. Acquittal [Docket No. 73]. Boedigheimer argued that there was insufficient evidence to convict on counts two and three of the Indictment. <u>Id.</u> Boedigheimer additionally argued that a new trial was warranted because of three errors: 1) prosecutors repeatedly suggested that Boedigheimer should be convicted because, as an attorney, he violated his duty to his profession and to the Court; 2) admitting Government Exhibit 269 into evidence; and 3) the prosecutor's question related to McCloud's prosecution. <u>Id.</u>

At sentencing, Boedigheimer's new defense counsel, Joseph P. Tamburino ("Tamburino"), relied upon the arguments made by Boedigheimer's trial counsel, Joseph S. Friedberg ("Friedberg"), in support of the judgment of acquittal motion. Sentencing Tr. [Docket

No. 123] at 3:4–14.  Regarding the motion for a new trial, Tamburino reiterated the arguments that were previously made by trial counsel and made one new argument stemming from an apparent misstatement Friedberg made in his closing argument.  Id. 12:25–13:11.

The Court denied the motions.  Id. 21:19.

### 2. Guideline Calculations

Prior to sentencing, Boedigheimer objected to portions of the Guideline calculations, including the two point enhancement for obstruction of justice.  See Def.'s Position Sentencing [Docket No. 87].  Those objections were withdrawn at sentencing.  Sentencing Tr. 22:17–18; 24:11–14.

The parties agreed that the Guidelines recommended a sentence between 87 and 108 months' imprisonment.  Id. 24:18-22.  The Court sentenced Boedigheimer to 60 months' imprisonment.  Id. 51:23–52:2.

### 3. Appeal

Boedigheimer appealed his conviction and sentence, arguing that the Court erred in denying the motion for mistrial and that his sentence was substantively unreasonable.  See United States v. Boedigheimer, 831 F.3d 954 (8th Cir. 2016).  The Eighth Circuit affirmed the denial of the motion for mistrial, as well as the 60 month sentence.  Id.

## G.  The 2255 Motion

In his 2255 Motion, Boedigheimer argues that his trial and appellate attorneys provided ineffective assistance of counsel.  Specifically, Boedigheimer argues that:  1) trial counsel effectively prevented him from accepting a favorable plea offer; 2) appellate counsel failed to appeal the Court's calculation of the amount of money laundered that supported the base offense

level; 3) trial counsel made "illogical" and "incomprehensible" statements to the jury during

trial; 4) trial counsel failed to raise an evidentiary issue in the motion for new trial; 5) appellate

counsel failed to appeal the two-point enhancement for obstruction of justice; and 6) appellate

counsel failed to appeal the denial of the motion for judgment of acquittal.  See 2255 Mot.

**H.  Motion to Amend**

On February 20, 2018, Boedigheimer filed a Motion to Amend his 2255 Motion.

Boedigheimer requests leave to amend under Federal Rule of Civil Procedure 15 to include the

allegation that his appellate counsel was ineffective for failing to appeal the objections to the

admission of Government Exhibits 266 and 269.

### III.  DISCUSSION

**A.  Section 2255 Standard**

28 U.S.C. § 2255 provides a person in federal custody with a limited opportunity to

collaterally attack the constitutionality, jurisdictional basis, or legality of their sentence.  See

United States v. Addonizio, 442 U.S. 178, 185 (1979).  Relief is reserved for violations of

constitutional rights and for a narrow range of injuries which, if untreated, would result in a

miscarriage of justice.  See Poor Thunder v. United States, 810 F.2d 817, 821–22 (8th Cir. 1987).

**B.  Ineffective Assistance of Counsel**

In Strickland v. Washington, the Supreme Court set forth the standard for claims of

ineffective assistance of counsel.  466 U.S. 668 (1984).  To properly demonstrate a claim, a

defendant must show that his attorney's representation fell below an objective standard of

reasonableness.  Id. at 687-88.  The defendant must also demonstrate that a reasonable

probability exists that but for the attorney's errors, the result of the proceeding would have been

different.  Id. at 694.  "[W]hen reviewing an ineffective-assistance-of-counsel claim, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Woods v. Donald, 135 S. Ct. 1372, 1375 (2015) (quotations omitted).

### 1. Trial Counsel

#### a. Plea Offer

Boedigheimer argues that his trial counsel was ineffective for effectively preventing him from accepting a favorable plea offer.  Boedigheimer claims the Government proposed resolving Boedigheimer's case by having him plead guilty to the false statement charge, but to provide a truthful factual basis to all three counts.  The offer did not include a sentencing recommendation, but the Guideline range for the false statement charge was 10 to 16 months' imprisonment. Boedigheimer claims that his counsel advised him to reject the offer and proceed to trial, advice Boedigheimer argues was constitutionally deficient.

Defendants have a Sixth Amendment right to counsel during the plea-bargaining process. Lafler v. Cooper, 566 U.S. 156, 162 (2012).  To demonstrate prejudice at the plea-bargaining stage, Boedigheimer must demonstrate a substantial likelihood that "(1) he would have accepted the offer to plead pursuant to the earlier proposed terms, (2) neither the prosecution nor the trial court would have prevented the offer from being accepted, and (3) the plea terms would have been less severe than under the judgment and sentence that were actually imposed."  Allen v. United States, 854 F.3d 428, 432 (8th Cir. 2017).  To show prejudice, Boedigheimer "must show that, but for his counsel's advice, he would have accepted the plea."  Sanders v. United States, 341 F.3d 720, 722 (8th Cir. 2003) (quotation omitted).  "A defendant who maintains his

innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer." Id. at 723.

Assuming without deciding that Boedigheimer's trial counsels' performance was objectively unreasonable, Boedigheimer's relentless denial of his culpability eviscerates any reasonable probability that he would have accepted the Government's offer. During trial, Boedigheimer maintained his innocence and testified at length of his version of the underlying facts. In response to the first question posed by his attorney, "what are you feeling at the moment?," Boedigheimer responded, "Like I'm in a surreal situation, little nervous, certainly scared, but I guess accepting that this is what I've got to do to prove my innocence." Trial Tr. 1462:11–14. When Boedigheimer was asked at trial why he did not discourage Lusk from attending the first proffer session when he knew that the money Lusk provided him was drug money, Boedigheimer responded, "Because I didn't commit a crime." Id. 1600:17–19. Additionally, Boedigheimer continuously asserted that he legitimately employed Lusk as an investigator, and that the purpose of the agreement was to give Lusk financial legitimacy in the eyes of banking institutions to further his real estate business. Id. 1672:6–12. Boedigheimer did not acknowledge the criminality of the arrangement, rather he characterized it as "poor judgment" and "harebrained." Id. 1672:16–17.

Boedigheimer's claim of innocence has continued even after the jury's guilty verdict. In his 2255 Motion, Boedigheimer still contends that Lusk was legitimately working for his firm, and that he believed the source of Lusk's money was from an inheritance and not marijuana trafficking. See 2255 Mot. 16, 26–35. Boedigheimer claims he never instructed Lusk to

withhold information regarding their financial arrangement for fear that it could "ruin" him, and that he did not delete any text messages from his cell phone.  Id. at 21, 23.

Boedigheimer's refusal to accept responsibility for his criminal behavior undermines his argument that he would have pleaded guilty but for the advice of counsel.  For this reason, his 2255 Motion on the grounds of the plea offer fails.

### b.  "Illogical" and "Incomprehensible" Statements

In his closing argument, trial counsel made a number of statements that Boedigheimer now isolates and argues are illogical and incomprehensible.  Boedigheimer contends that the cumulative effect of the statements constituted ineffective assistance of counsel.  During his closing argument, his counsel described Boedigheimer's financial arrangement with Lusk as "poor judgment," "stupid," and "improper bookkeeping," and told the jury that he was unable to say what the proper verdict should be in this case.  Trial Tr. 1835: 4–10; 1853:12–17; 1858:21–24.  He concluded his argument by stating that Boedigheimer "needs to be found guilty on all three counts."  Id. 1868:12–19.

The Constitution's guarantee of effective counsel extends to closing arguments. Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  Due to the broad tactical decisions that guide an attorney's closing argument, review at this stage is "highly deferential."  Guzman-Ortiz v. United States, 849 F.3d 708, 714 (8th Cir. 2017).  Counsel "has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." Yarborough, 540 U.S. at 5–6.

Defense counsel's closing argument embraced an understated approach intended to earn

credibility with the jury and impress upon them the gravity of their upcoming deliberation. This is a reasonable strategy, and one which this counsel has successfully used for many years. Acknowledging the complexity of the case encourages jurors to be diligent in their deliberations and builds rapport by being realistic and truthful. This builds empathy, which Yarborough recognized as "a technique that dates back to Aristotle." Id. at 11. Statements that his financial arrangement with Lusk was ill-advised was consistent with Boedigheimer's own testimony and was a candid admission of the suspicious, but explainable, nature of their agreement.

The jury heard testimony that on multiple occasions Lusk gave Boedigheimer large amounts of cash and that Boedigheimer would later repay Lusk with a check. This arrangement is suspicious on its face, and the acknowledgment in argument of its questionable nature legitimizes counsel's argument that his client is guilty of bad judgment but not a crime.

Friedberg's obvious misstatement or "slip of the tongue" that Boedigheimer needs to be found guilty on all three counts, ignores the context of the entire argument. Sentencing Tr. 13:22. Immediately prior to this statement, counsel had described witness Lusk as a serial liar, and that his dishonesty was designed to benefit him and his father.[3] Counsel explained that Lusk's deception rendered his entire testimony completely unbelievable and, once it was discarded, the remaining evidence inculpating Boedigheimer was merely circumstantial. Trial Tr. 1866:10–1868:4. Friedberg then told the jury an anecdote about how relying exclusively on circumstantial evidence may lead to an erroneous result, and that the circumstantial evidence in this case permitted two reasonable conclusions, one of guilt and one of innocence. Id.

---

[3] During trial, testimony was elicited that Lusk and his father purchased property together at a time when his father knew Lusk was distributing marijuana. Trial Tr. 1041:2–24. Unlike Boedigheimer, Lusk's father was not charged with money laundering. Id. 1043:3–4.

1866:10–1868:11.  The argument concluded by admonishing the jury "you are bound to accept the [conclusion] of innocence."  Id. 1868:10–11.

    With this context in mind, it is clearly evident that Friedberg misspoke by unintentionally leaving out the word "not" when he asked for a guilty verdict.  Boedigheimer was not deprived of effective assistance of counsel.

### c. Evidentiary Issue in Motion for New Trial

    During trial, Lusk was cross-examined about his father's knowledge of his drug distributing business, and how he used cash to renovate a bar the two of them bought together. Counsel inquired, "Now, you know your father's not going to be prosecuted, right?"  Id. 1041:25–1042:1.  This elicited a hearsay objection, which the Court sustained.  Id. 1042:2–3.  In his 2255 Motion, Boedigheimer claims this testimony showed that Lusk's father was laundering drug money but was not charged, and the Court's ruling on the objection eliminated proof that Lusk was motivated to lie in exchange for leniency and his father's immunity.  2255 Mot. 16, 17. Boedigheimer claims that this testimony "was the crown jewel" of his defense, and his trial counsels' failure to challenge the evidentiary ruling in the motion for a new trial constituted ineffective assistance of counsel.  Id. at 16.

    Contrary to Boedigheimer's assertion, the Court's sustaining of the objection did not prevent his attorney from extracting testimony that Lusk was motivated to lie to protect his father.  Immediately after the objection was sustained, counsel rephrased his question.  In response, Lusk testified that:  1) the government knew that he and his father had purchased property together, 2) Lusk had contributed a large amount of cash towards purchasing and renovating the building, 3) his father knew that he was trafficking marijuana, and 4) his father

had not been charged.  Trial Tr. 1042:19–1043:4.  Other witnesses also highlighted Lusk's desire to protect his father.  Lusk's sister, Boedigheimer's wife, testified that Lusk "would do anything to protect his 70-year-old father because he did not want to see him go to prison."  Id. 1407:9–11.  Agent Schad testified that Lusk's father knew Lusk's source of money was from trafficking marijuana, and that Lusk was aware that his father could be prosecuted for money laundering.  Id. 747:18–748:8.  Finally, in closing argument, counsel implored the jury to completely discard Lusk's testimony as untruthful.  Therefore, there was nothing deficient about electing not to pursue this evidentiary ruling in the motion for a new trial.

Even if it was found to be unreasonable to omit this issue in the motion for a new trial, the argument still fails because Boedigheimer did not suffer any prejudice.  The jury found him guilty despite hearing evidence from multiple witnesses suggesting that Lusk would lie to protect his father.  There is no reason to believe that additional evidence on this point would have altered the jury's verdict.

### 2.  Appellate Counsel

Boedigheimer's appellate counsel filed a direct appeal raising issues that:  1) the Court abused its discretion by denying the motion for mistrial premised on the questions concerning McCloud's prosecution, and 2) the Court abused its discretion in sentencing the defendant to 60 months' imprisonment.  See Boedigheimer, 831 F.3d at 956.  Boedigheimer now argues that his appellate counsel was ineffective because he:  1) failed to appeal the Court's calculation of the total amount of illicit money laundered, which supported the base offense level; 2) failed to challenge a two-point enhancement for obstruction of justice; and 3) failed to appeal the denial of the motion for judgment of acquittal.  "Ineffectiveness of appellate counsel is measured under

16

the standard set out in <u>Strickland</u>."  <u>Henderson v. Sargent</u>, 926 F.2d 706, 709–10 (8th Cir. 1991).

### a. Total Amount of Money Laundered

Prior to sentencing, Boedigheimer objected to the value of the laundered funds stated in the Presentence Report ("PSR").  PSR A.2.  The PSR determined that the trial evidence demonstrated that Boedigheimer had laundered more than $70,000 but less than $120,000.  PSR ¶ 34.  This loss amount resulted in an eight-point increase and yielded a base offense level of 16. <u>Id.</u>  Boedigheimer withdrew this challenge at sentencing, and the Court adopted the PSR and sentenced Boedigheimer with a total offense level of 28, which included the eight-point increase for the loss amount.[4]  Boedigheimer now revives his previously abandoned argument and contends that the trial evidence failed to show that he laundered more that $70,000. Boedigheimer argues that his appellate counsel was ineffective for failing to pursue this issue on direct appeal.

Boedigheimer's appellate counsel's decision not to raise this argument on appeal was not objectively unreasonable.  The jury heard substantial testimony about the cash loans and payroll advances that Lusk provided to Boedigheimer and his law firm.  While Boedigheimer's trial counsel attempted to discredit Lusk and convince the jury that Boedigheimer was an unwitting money launderer, the jury's verdict demonstrates Boedigheimer's guilt beyond a reasonable doubt.  Since the enhancement for the amount of laundered funds needs only to be proven by a preponderance of the evidence, pressing this issue on appeal would not have been successful. <u>United States v. Washburn</u>, 444 F.3d 1007, 1014 (8th Cir. 2006) (citing <u>United States v. Pirani</u>,

---

[4] Boedigheimer's total adjusted offense level also included a two-point obstruction enhancement.  PSR ¶ 52.

406 F.3d 543, 551 n.4 (8th Cir. 2005) (en banc)).

Moreover, even if it was an error not to appeal this issue, Boedigheimer's argument still fails because he cannot show prejudice. In his 2255 Motion, Boedigheimer contends the loss amount proven at trial was, at most, $50,000. The Guidelines in effect at the time of sentencing called for a six-point increase for laundering more than $30,000 but less than $70,000. See U.S.S.G. § 2B1.1(b). With a six, rather than eight, point increase, Boedigheimer's total adjusted offense level would have been 26. An offense level of 26 with a criminal history category II yields a Guideline sentence range of 70–87 months' imprisonment, which is higher than the 60-month sentence Boedigheimer received. As a result, Boedigheimer cannot demonstrate that his sentence would have been lower. See Williams v. United States, No. 16-172, 2016 WL 7033757, at *5 (E.D. Mo. Dec. 2, 2016) (concluding no prejudice to defendant when low end of new guideline range was still above the sentence imposed); Guzman-Ortiz v. United States, No. 14-4062, 2015 WL 5038004, at *9–10 (D.S.D. Aug. 26, 2015) (same).

### b. Obstruction Enhancement

The PSR included a two-point sentence enhancement for obstruction of justice. PSR ¶¶ 25, 30. The pre-sentence pleadings initially objected to this enhancement, but the objection was withdrawn at sentencing. Boedigheimer now contends that his appellate attorney was ineffective for failing to challenge the obstruction enhancement on direct appeal.

Boedigheimer's attorney reasonably decided not to challenge the obstruction enhancement on direct appeal. Contrary to Boedigheimer's assertions, the evidence introduced at trial provided strong evidentiary support for the two-point obstruction charge. The jury heard testimony that Boedigheimer urged Lusk to refrain from telling law enforcement about their

financial arrangement, deleted particularly incriminating text messages from his cellular telephone, and obfuscated the truth about Lusk's employment with his law firm. The jury returned a guilty verdict on all counts. The conviction on Count 3 established that the Government had proven beyond a reasonable doubt that Boedigheimer made a material false statement to an IRS agent concerning Lusk's "employment" at his law firm. This false statement materially impaired the Government's investigation into the money laundering offense conduct. These facts need only to have been supported by a preponderance of the evidence to make the two-point obstruction enhancement appropriate. See United States v. Whiting, 522 F.3d 845, 850 (8th Cir. 2008) ("The government bears the burden of proving the facts to support [an obstruction of justice enhancement] by a preponderance of the evidence.").

Boedigheimer continues to dispute the facts accepted by the jury supporting his guilt. He argues, for example, that he never told Lusk that it would "ruin" him if law enforcement learned about their financial arrangement. 2255 Mot. 19. Boedigheimer attempts to support this by arguing that he was essential to securing Lusk's attendance at the first proffer with law enforcement, and that if he was truly concerned about Lusk disclosing their financial arrangement, he would have advised Lusk not to speak with law enforcement altogether. Similarly, Boedigheimer disputes that he deleted text messages, arguing that if he was going to delete incriminating messages he would have deleted more than the five messages discussed at trial. These arguments were rejected by the jury. Accordingly, it was objectively reasonable to not appeal this meritless argument. See Thai v. Mapes, 412 F.3d 970, 978 (8th Cir. 2005) ("In our view, [Boedigheimer's] claim fails because [he] cannot show that his counsel performed deficiently by failing to raise a meritless argument.").

19

Moreover, eliminating the two-point obstruction enhancement yields a guideline range of 70–87 months, which remains above the 60 month sentence imposed. Thus, Boedigheimer cannot demonstrate the prejudice needed to prevail on this claim. Williams, 2016 WL 7033757, at *5; Guzman-Ortiz, 2015 WL 5038004, at *9–10.

### c. Motion for Judgment of Acquittal or for a New Trial

Finally, Boedigheimer contends that his appellate counsel should have appealed the denial of the Motion for Judgment of Acquittal or Motion for a New Trial. Boedigheimer argues that: 1) the evidence supports his assertion that he was unaware that Lusk was a drug dealer, 2) he believed the source of Lusk's money was legitimate, and 3) he hired Lusk as a lawful employee of his law firm.

The essence of Boedigheimer's argument is that Lusk is not credible. But an appellate court does not generally disturb the credibility determinations of the jury. See United States v. Sturdivant, 513 F.3d 795, 800 (8th Cir. 2008) ("This court is obligated to defer to the jury's determination of the credibility of the witnesses, and will not second-guess the jury's credibility determination of the Government's witnesses.") (quotations omitted)). Viewing the evidence in light of the jury's verdict, the inescapable conclusion is that the jury credited Lusk and the other witnesses' testimony over Boedigheimer's. These are the very types of determinations that will not be overturned by an appellate court. Accordingly, Boedigheimer's appellate counsel did not provide deficient representation by not appealing the denial of the Motion for Judgment of Acquittal or Motion for a New Trial.

## C.  Motion to Amend

Boedigheimer continues to argue that his objections to Government Exhibits 266 and 269

were erroneously overruled.  Exhibit 266 is a summary chart prepared by Agent Schad purporting to show cash payments to Boedigheimer between May 2009 and January 2011.  Trial Tr. 1174:14–20.  Exhibit 269 is a summary of Lusk and Boedigheimer's cash payroll agreement. Id. 1175:3–6.  During trial, Boedigheimer's trial counsel objected on foundation grounds to the admission of both exhibits, but his objections were overruled.  Id. 1174:21–1175:16.  Later, Boedigheimer's trial counsel again argued that Government Exhibits 266 and 269 were erroneously admitted.  Id. 1333:17–1334:21.  The Court was not convinced to reverse its prior rulings.  Id. 1334:22–24. Boedigheimer now moves for leave to amend to include the allegation that his appellate counsel was ineffective for not pressing these objections on appeal.

A request for leave to amend in a post-conviction proceeding is left to the discretion of the trial court.  Clemmons v. Delo, 177 F.3d 680, 686 (8th Cir. 1999), cert. denied, 528 U.S. 1011, (1999).  While leave to amend is to be freely given "when justice so requires," that license is not absolute. Fed. R. Civ. P. 15(a)(2).  "Futility is a valid basis for denying leave to amend." United States ex rel. Lee v. Fairview Health Sys., 413 F.3d 748, 749 (8th Cir. 2005) (citation omitted).

Boedigheimer's Motion to Amend is denied as futile.  Trial counsel unsuccessfully objected to the admission of these exhibits multiple times during trial.  With respect to Government Exhibit 269, Boedigheimer's trial counsel argued in their Motion for Judgment of Acquittal or for a New Trial that it "was central to the Government's case" and that it was error for it to be admitted.  Mot. J. Acquittal 4.  The Court again declined to revisit its ruling.

It would have been meritless to pursue this issue on appeal.  "A district court is possessed with broad discretion in its evidentiary rulings made at trial."  Cavataio v. City of Bella Villa,

21

570 F.3d 1015, 1020 (8th Cir. 2009).  Reversal of evidentiary rulings will only be made if "they amount to 'a clear and prejudicial abuse of discretion.'"  Id. (quoting Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008)).  The testimony at trial supported overruling Boedigheimer's objection on foundation grounds.  Given the broad latitude afforded by the Eighth Circuit on these rulings, Boedigheimer's appellate counsel was not ineffective for abandoning these objections on appeal.

Moreover, Boedigheimer suffered no prejudice.  As discussed above, to succeed on an ineffective assistance of counsel argument there must be a reasonable probability that but for the attorney's errors, the result would have been different.  Strickland, 466 U.S. at 694.  The jury heard extensive testimony from Lusk and Boedigheimer themselves about their financial arrangements.  There is simply no basis to conclude that Government Exhibits 266 or 269 were pivotal in the jury's analysis and that Boedigheimer would have been acquitted if those exhibits were not considered by the jury.

**D.  Evidentiary Hearing**

Boedigheimer requests an evidentiary hearing.  "An evidentiary hearing on a § 2255 petition may be denied if 'the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief.'"  Noe v. United States, 601 F.3d 784, 792 (8th Cir. 2010) (quoting 28 U.S.C. § 2255(b)).  Because the Motion, files and record of this case conclusively show that Boedigheimer is not entitled to § 2255 relief, the request for an evidentiary hearing is denied.

**IV.  CERTIFICATE OF APPEALABILITY**

The Court may grant a certificate of appealability only where a defendant has made a

substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Tiedeman v. Benson, 122 F.3d 518, 523 (8th Cir. 1997).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  The Court finds it unlikely that another court would decide the issues raised in this 2255 Motion differently, or that any of the issues raised in Boedigheimer's 2255 Motion would be debatable among reasonable jurists.  Thus, the Court declines to grant a certificate of appealability.

## V.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Robert David Boedigheimer's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence [Docket No. 130] is **DENIED**.  Boedigheimer's Motion to Amend [Docket No. 137] is also **DENIED**.  A certificate of appealability shall not issue.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 7, 2018.